## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

STARR INDEMNITY & LIABILITY
COMPANY, INC. a/s/o Breakthru
Beverage Minnesota Wine & Spirits,
LLC, and BREAKTHRU BEVERAGE
MINNESOTA WINE & SPIRITS,
LLC,

                    Plaintiffs,

v.

JPF INC., JRO GLOBAL, INC., and
EASY EXPRESS,

                    Defendants.

JPF INC.,

                    Third-Party Plaintiff,

v.

JRO GLOBAL, INC.,

                    Third-Party Defendant.

Case No. 22-cv-3007 (LMP/DTS)

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT**

---

John T. Lillis, Jr., Kennedy Lillis Schmidt & English, **New York, NY**, for Plaintiffs Starr Indemnity & Liability Company, Inc. and Breakthru Beverage Minnesota Wine & Spirits, LLC.

Jason E. Engkjer and Schaefer D. Whiteaker, DeWitt LLP, **Minneapolis, MN**, for Defendant and Third-Party Plaintiff JPF Inc.

Daniel R. Savaloja, Law Offices of Daniel R. Savaloja, PLLC, **Blaine, MN**, for Defendant Easy Express, LLC.

Breakthru Beverage Wine & Spirits, LLC ("BTB") is a wholesale wine, spirit, and beer distributor.  In 2021, BTB purchased liquor from the Jack Daniel's distillery in Tennessee.  ECF No. 1 ¶ 16.  BTB hired Defendant JPF Inc. ("JPF"), with whom it had a long-standing relationship, to arrange transportation for the shipment to Minnesota.  *Id.* ¶ 17.  JPF, in turn, hired Defendant JRO Global, Inc. ("JRO") to transport the liquor, *id.* ¶ 21, who in turn contracted with Defendant Easy Express for the transport, *id.* ¶ 22.  Although the liquor was picked up in Tennessee, it never made it to Minnesota and is presumed stolen.  *Id.* ¶¶ 25–26.  BTB estimated that it lost $288,621.25 and submitted an insurance claim to Starr Indemnity & Liability Company, Inc. ("Starr"), who paid $188,621.25 to settle the claim with BTB.  *Id.* ¶ 28.

On December 1, 2022, Starr brought this action against Defendants, alleging that each breached a contract of motor carriage made pursuant to the Carmack Amendment, 49 U.S.C. § 14706 *et seq.*, and that JPF is alternatively liable under a theory of negligence.  *Id.* ¶¶ 30–46.  JPF answered and brought a crossclaim against JRO for breach of contract.  ECF No. 21 at 11.  JRO has never appeared in this litigation, and the Clerk of Court entered default judgment against JRO on April 28, 2023.  ECF No. 22.

JPF and Easy Express now move for summary judgment against Starr.  ECF Nos. 43, 49.  JPF argues that it is not subject to the Carmack Amendment and that Starr's negligence claim is preempted by federal law or otherwise meritless.  *See generally* ECF No. 44.  Easy Express argues that it performed its contract and is therefore not liable under any theory of liability.  *See generally* ECF No. 50.

Because genuine disputes of material fact preclude summary judgment for either JPF or Easy Express on Starr's Carmack Amendment claim, the Court denies summary judgment on those claims. But because Starr has abandoned its negligence claim, the Court grants JPF summary judgment on that claim.

## BACKGROUND

### I.     BTB's July 2021 Shipment is Lost

In June 2021, BTB contracted with Brown-Forman Beverages Worldwide ("Brown-Forman"), the owner of the Jack Daniel's distillery in Lynchburg, Tennessee, for the purchase of liquor. ECF No. 58-1. Brown-Forman prepared a purchase order indicating that the shipment was to be delivered to BTB's address in St. Paul, Minnesota, "via JPF Inc." *Id.* at 2–3.

At some point after the purchase, BTB came to an oral agreement with JPF to assist in transporting the liquor from Tennessee to Minnesota, with a requested shipping date of July 3, 2021. ECF No. 46 ¶¶ 13–14; ECF No. 58 ¶ 13. That agreement was reflected in a bill of lading in which "JPF Inc." is listed as the "carrier" or "shipper." ECF No. 46-4 at 1. The bill of lading also included a note under the heading "carrier information" to "send email to both of JPF contact[s]," and listed two employees of JPF along with their email addresses. *Id.* at 1. BTB and JPF agree that Brown-Forman created the bill of lading, ECF No. 58 ¶ 18; ECF No. 46 ¶ 29, but BTB acknowledges that it "assigned JPF as BTB's carrier" in the initial purchase order, ECF No. 58 ¶ 13.

Brown-Forman did not have the order ready on July 3, 2021, and informed JPF that the order would be ready for pickup on July 21, 2021. ECF No. 46 ¶ 15. JPF, which

identifies itself as a "broker," *id.* ¶ 5, states that because the carrier it usually used to transport liquor from Tennessee to Minnesota was unavailable, it had to find an alternative. *Id.* ¶ 15. JPF eventually identified JRO as a carrier capable of handling the shipment. *Id.* ¶ 16–17. JPF then executed a "carrier/broker" agreement with JRO, which identifies JRO as the carrier and JPF as the broker. ECF No. 46-2. The agreement further states that JRO agreed that "[s]hipper's insertion of [JPF]'s name as the carrier on the bill of lading shall be for shipper's convenience only and shall not change [JPF]'s status as a property broker nor [JRO]'s status as a motor carrier." *Id.* at 2. The agreement also stated that JRO was not allowed to reassign the shipment to another carrier without JPF's written consent. *Id.*

JRO, unbeknownst to JPF, assigned the load to Easy Express through "AB Broker Inc." ECF No. 46-5; ECF No. 46 ¶¶ 33–34. Easy Express identifies itself as a carrier that "would often work with Freight Brokers" in "booking loads for transport by Easy." ECF No. 51 ¶ 6. In so doing, it does not contract directly with the shipper or the receiver, but instead solely with the broker. *Id.* ¶¶ 7–8. On July 23, 2021, Easy Express executed a "load confirmation" with AB Broker ("AB"). ECF No. 46-5. Within the confirmation, AB notated to Easy Express that the shipment was a "blind shippment [sic]" and told Easy Express to "check in [a]s JRO Global" and to "make sure driver say[s] load going to: St. Paul, MN." ECF No. 46-5. However, the confirmation stated that Easy Express should deliver the shipment to an address in Illinois. *Id.*

The bill of lading, which included the correct address for BTB in Minnesota and was issued by Brown-Forman on July 23, 2021, confirmed that the load was picked up on that date by a driver from Easy Express. ECF No. 46-4. But the load never made it to

Minnesota. Instead, according to the load confirmation, Easy Express delivered the shipment to Illinois. ECF No. 51 ¶¶ 18–19. Indeed, Easy Express states that "blind shipments" are common in the freight industry and are "where we pick up a load and on the bill of lading, we see one delivery address[,] but we actually need to deliver to another one." *Id.* ¶ 13. Easy Express's assumption is that once it delivers to the new address, "the broker most likely consolidates the load and gets another carrier to finish the shipment." *Id.* Easy Express states that it was "contractually required to follow the delivery instructions provided to it by AB." *Id.* ¶ 18. Thus, despite the bill of lading indicating a St. Paul delivery address, Easy Express delivered the shipment to Illinois. *Id.* ¶ 19.

Shortly after the product was supposed to have been delivered, BTB called JPF directly to ask where it was. ECF No. 58 ¶ 24; ECF No. 46 ¶ 28. BTB states that in that call, JPF's president "explained that he could not get his usual trucker in time to meet BTB's delivery appointment, so he panicked and posted the load online late Friday afternoon to a broker bid board." ECF No. 58 ¶ 25. JPF thereafter called Brown-Forman directly, who informed JPF that the load had been picked up and provided JPF with the bill of lading. ECF No. 46 ¶¶ 28–29. That was the first time JPF learned of Easy Express's involvement. *Id.* ¶ 30.

Because it never reached BTB, the liquor is now presumed stolen. ECF No. 46 ¶ 33. Pursuant to its purchase order, BTB paid Brown-Forman for the liquor. ECF No. 58 ¶ 21. It then submitted a claim directly to JPF stating that it considered JPF liable for the loss. ECF No. 58-5. BTB thereafter submitted an insurance claim to Starr for $288,621.25, for

which it received $188,621.25.  ECF No. 58-6.  The difference reflected a $100,000 deductible BTB was responsible for under the terms of the policy.  ECF No. 1 ¶ 28.

During the process of submitting its insurance claim to Starr, BTB's Risk and Assurance director sent an email to a claims manager for Starr on August 5, 2021, in which he notes that the claim was "for orders of Jack Daniels brokered through JPF Logistics." ECF No. 45-1 at 56.  The same email also asks BTB's purchasing manager to "place JPF Logistics on Notice for the replacement cost value."  *Id.*  On November 18, 2021, the director sent another email to Starr regarding the claim, noting that BTB did not "feel confident in [its] ability to collect from the shipping broker or carrier, and thus would like to proceed through this claim."  *Id.* at 57.  Finally, in the actual claim submitted to Starr, BTB noted that the bill of lading was completed "Identifying Freight Broker JPF as Carrier(?)."  *Id.* at 58.

## II.    BTB and JPF's Prior Relationship and Dealings

JPF's current President, Sean Farah, explained in a declaration that JPF "has been in the business as a transportation broker since the 1990s."  ECF No. 46 ¶ 9.  JPF maintains that it is a federally authorized transportation broker and that, in that role, it connects customers with carriers to transport cargo.  *Id.*  JPF has never owned any equipment to transport cargo and "has never transported a single load of cargo to any customer, including [BTB]."  *Id.* ¶ 8.  JPF and BTB have worked together since the 1990s, and BTB "regularly contacted JPF to arrange transportation for [BTB's] beer, wine and spirit products from [BTB's] supplier facilities."  *Id.* ¶ 9.  JPF would then "connect[] [BTB] with its network of motor carriers to transport [BTB's] loads."  *Id.*  Between 2016 and 2021, JPF estimates it

"brokered, on average, between 150 and 250 loads per year on behalf of [BTB]" but that their relationship was never reduced to writing. *Id.* ¶¶ 12–13.

BTB acknowledges its long-standing relationship with JPF; in fact, BTB submits 263 bills of lading reflecting all of BTB's and JPF's shipping arrangements for 2021. *See generally* 58-2. In almost every single one, JPF is listed as the "carrier." *Id.* BTB's representative explained that he considers "everyone [he] assign[s] a purchase order for" to be a "carrier" because "[t]hey are responsible for delivering [the] load safely and completely." ECF No. 58 ¶ 11. He further stated that the relationship between the two parties was "governed by the bills of lading issued for various loads." *Id.* ¶ 15.

## III.    Procedural Background

On December 21, 2022, Starr brought this action against JPF, JRO, and Easy Express, alleging that each is liable for the stolen delivery under the Carmack Amendment, 49 U.S.C. § 14706 *et seq.* ECF No. 1 ¶¶ 30–34. Starr alternatively alleges that JPF is liable under a theory of negligence, asserting that JPF negligently hired JRO to deliver the shipment. *Id.* ¶¶ 35–46. Starr seeks monetary damages in the amount of $288,621.25, reflecting its $188,621.25 payment to BTB and BTB's $100,000 deductible. *Id.* ¶¶ 34, 46.

On April 10, 2023, JPF answered Starr's complaint and asserted a crossclaim against JRO. *See generally* ECF No. 21. JPF asserts that JRO is liable for breaching their contract and is otherwise liable for JPF's indemnification. *Id.* at 11–12. On May 27, 2025, JPF and Easy Express moved for summary judgment as to Starr's claims. ECF Nos. 43, 50.

## ANALYSIS

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Hustvet v. Allina Health Sys.*, 910 F.3d 399, 406 (8th Cir. 2018). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When considering a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). But courts "must not weigh evidence or make credibility determinations." *Sanimax USA, LLC v. City of S. St. Paul*, 95 F.4th 551, 558 (8th Cir. 2024) (internal quotation marks omitted) (citation omitted).

## I.    The Carmack Amendment

The Carmack Amendment "created a nationally uniform rule of carrier liability concerning interstate shipments." *REI Transp., Inc. v. C.H. Robinson Worldwide, Inc.*, 519 F.3d 693, 697 (7th Cir. 2008) (citation omitted). In relevant part, the Carmack Amendment states:

> A carrier providing transportation or service . . . and any other carrier that delivers the property and is providing transportation or service . . . are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States . . . .

8

49 U.S.C. § 14706(a)(1).  In essence, the Carmack Amendment "imposes liability on carriers for 'actual loss or injury' to goods damaged in interstate transport." *Just Take Action, Inc. v. GST (Ams.) Inc*., No. 04-cv-3024 (ADM/RLE), 2005 WL 1080597, at *4 (D. Minn. May 6, 2005) (quoting 49 U.S.C. § 14706(a)(1)).

The general rule "is that an interstate carrier is strictly liable for damages up to 'the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) [certain intermediary carriers].'"  *Certain Underwriters at Int. at Lloyds of London v. United Parcel Serv. of Am., Inc.*, 762 F.3d 332, 335 (3d Cir. 2014) (alteration in original) (quoting 49 U.S.C. § 14706(a)(1)).  "Making carriers strictly liable relieved a shipper of the burden of having to determine which carrier damaged or lost its goods . . . [and] also eliminated the shipper's potentially difficult task of proving negligence."  *Id.* (citing *Sec'y of Agric. v. United States*, 350 U.S. 162, 173 (1956) (Frankfurter, J., concurring)).  For that reason, the Carmack Amendment "makes the final, or 'delivering,' carrier liable to the shipper as well" as the original carrier, so "the aggrieved shipper need only sue the initial ('receiving') or final ('delivering') carrier and need not seek out the carrier actually at fault."  *CNA Ins. Co. v. Hyundai Merch. Marine Co*., 747 F.3d 339, 353 (6th Cir. 2014); *see also Ever Better Eating, Inc. v. Jama's Express LLC*, No. 8:21-cv-1798-CEH-CPT, 2022 WL 17782391, at *8 (M.D. Fla. Dec. 19, 2022) ("[T]he

existence of one carrier does not preclude the liability of other carriers, because the Carmack Amendment expressly provides for the liability of more than one carrier.").[1]

To prove a carrier is liable under the Carmack Amendment, a plaintiff must show: (1) delivery to the carrier in good condition; (2) arrival to the purchaser in damaged condition; and (3) the amount of damages. *REI Transp.*, 519 F.3d at 699. If a plaintiff establishes those prima facie elements, the burden shifts to the carrier to prove the damage or loss was caused by (a) an act of God; (b) the public enemy; (c) the act of the shipper itself; (d) public authority; (e) or the "inherent vice or nature of the goods." *Mo. Pac. R.R. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964) (citations omitted). Notably, liability under the Carmack Amendment applies only to carriers, not brokers, "which are purposefully distinguished from motor carriers." *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1300 (11th Cir. 2018).

## I.    JPF's Motion for Summary Judgment

JPF argues that it is entitled to summary judgment on Starr's Carmack Amendment claims because it indisputably operated as a broker, not a carrier. ECF No. 44 at 16–25. JPF also argues that it is entitled to summary judgment on Starr's negligence claim because federal law preempts all state-law causes of action in this field, *id.* at 25–31, or because the claim fails as a matter of law, *id.* at 31–36.

---

[1]    Although a plaintiff can seek liability against any carrier, the Carmack Amendment allows the "initial carrier found strictly liable . . . to be indemnified by the carrier 'over whose line or route the loss or injury occurred.'" *PNH Corp. v. Hullquist Corp.*, 843 F.2d 586, 589 (1st Cir. 1988) (quoting 49 U.S.C. § 14707(b)).

## A.      Applicability of the Carmack Amendment

A "motor carrier" under the Carmack Amendment is defined as "a person providing motor vehicle transportation for compensation."  49 U.S.C. § 13102(14).  A "broker," on the other hand, is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation."  49 U.S.C. § 13102(2).  Therefore, "the operative textual distinction between a broker and a motor carrier is whether a party *provides transportation* with regard to a given shipment, or whether it *sells*, *negotiates*, or *holds itself out* as providing transportation of that shipment."  *Essex*, 885 F.3d at 1300.

The difference between a broker and a carrier "is a blurry one."  *Id.*  In an effort to provide guidance on the blurry distinction, the United States Department of Transportation ("DOT") has explained that:

> Broker means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or *offer to arrange the transportation of* shipments which they are authorized to transport and *which they have accepted and legally bound themselves to transport.*

49 C.F.R. § 371.2 (emphasis added).  Tracking that language, courts unanimously recognize that an entity qualifies as a carrier when "it has agreed with the shipper to accept legal responsibility for that shipment."  *Essex*, 885 F.3d at 1301; *see also Tryg Ins. v. C.H. Robinson Worldwide, Inc.*, 767 F. App'x 284, 286–87 (3d Cir. 2019) ("[I]n determining whether a party is a carrier or a broker, the crucial question is whether the party has legally

11

bound itself to transport goods by accepting responsibility for ensuring the delivery of the goods."); *Richwell Grp., Inc. v. Seneca Logistics Grp., LLC*, 425 F. Supp. 3d 57, 61 (D. Mass. 2019) (citations omitted) ("[C]ourts have found that a party is a carrier in a 'specific transaction' if it takes responsibility for a shipment, whether or not it performed the actual transportation or labels itself as a broker."). "In any case, the operative inquiry is this: pursuant to the parties' agreement, with whom did the shipper entrust the cargo?" *Essex*, 885 F.3d at 1302. Whether an entity accepted legal responsibility is a "case-specific" question, and any number of factors might prove relevant in assessing any specific transaction. *Id.* For that reason, the question is "not well suited to summary judgment." *Lotte Ins. Co. v. R.E. Smith Enters., Inc.*, 733 F. Supp. 3d 494, 505 (E.D. Va. 2024) (citation omitted); *Essex*, 885 F.3d at 1302 (noting that "summary judgment might not be appropriate in many [Carmack Amendment] cases.").

JPF acknowledges that the inquiry is fact-intensive but argues that this is the rare case in which "there is nothing in the record that could remotely serve to create a genuine issue of fact as to whether JPF 'held itself out' or accepted responsibility for the subject load as a motor carrier." ECF No. 44 at 20. First, JPF asserts that it "is, and always has been, registered with the [Federal Motor Carrier Safety Administration] (FMCSA) as a federally authorized transportation broker." *Id.* at 17. It also asserts that it "has never owned a single piece of equipment, never employed drivers and certainly did not transport the load at issue in this matter" and, in fact, "never transported a single load on behalf of [BTB] or any customer." *Id.* JPF also points to its contract with JRO, which identifies JPF as a broker and JRO as a carrier. *Id.* Finally, it argues that the post-incident emails sent by

12

BTB's director of risk and assurance, which alludes to JPF as the "broker," show that even BTB understands JPF to be a broker. *Id.* at 23–24.

    None of these facts conclusively determines that JPF operated as a broker for this "particular transaction." *Richwell Grp.*, 425 F. Supp. 3d at 61. For instance, whether JPF is identified as a broker or carrier in the FMCSA, and whether it identifies itself as a broker in its contract with JRO, are relevant factors, but a company's self-description or DOT registration as a "broker" is not dispositive. *See Hewlett-Packard Co. v. Brother's Trucking Enters., Inc.*, 373 F. Supp. 2d 1349, 1352 (S.D. Fla. 2005) ("Whether a company is a broker or a carrier is not determined by what the company labels itself, but by how it represents itself to the world and its relationship to the shipper."); *Neb. Turkey Growers Co-op Ass'n v. ATS Logistics Servs., Inc.*, No. 4:05CV3060, 2005 WL 3118008, at *4 (D. Neb. Nov. 22, 2005) (citation omitted) ("The law determines status according to the services offered by an entity, rather than by its corporate character or declared purpose."). Further, JPF's claim that it cannot be a carrier because it is incapable of physically transporting *any* shipments incorrectly narrows the definition of carrier to only entities who physically transport shipments. *See Tryg*, 767 F. App'x at 286–87 ("The statutory text makes clear that being a carrier entails more than just physically picking up shipments and transferring them to a different location. . . . If an entity accepts responsibility for ensuring the delivery of goods, then that entity qualifies as a carrier regardless of whether it conducted the physical transportation."); *see also Richwell Grp.*, 425 F. Supp. 3d at 61 (finding non-dispositive that a company "has no trucks, drivers, or infrastructure that a traditional carrier would have" and that company utilized third-party carriers for each of the previous orders between

13

the parties).  Finally, that BTB refers to JPF as the "broker" in post-incident documents undoubtedly is relevant.  But JPF fails to acknowledge that BTB *also* referred to JPF as a "carrier" directly to Brown-Forman when it purchased the liquor, and that designation was reflected in the hundreds of bills of lading prepared throughout 2021.  *See generally* 58-2.  JPF argues that the Court should accept BTB's labeling in the post-incident emails as dispositive but should ignore the pre-incident labeling because "[s]imply calling or referring to JPF a motor carrier does not make it a fact."  ECF No. 44 at 20.  But JPF essentially asks the Court to weigh the evidence in the record, which the Court cannot do on summary judgment.  *See Sanimax USA*, 95 F.4th at 558.

Conversely, there are facts in the record upon which a jury could reasonably conclude that JPF operated as a carrier in the transaction at issue.  For instance, the bill of lading identified JPF as the carrier of the load and included a note under the heading "carrier information" to "send email to both of JPF contact[s]."  ECF No. 46-4 at 1.  JPF argues that "a bill of lading prepared by a third party, which erroneously identities the broker as the 'carrier' of the load, does not establish the broker's liability under Carmack where the broker played no role in its preparation."  ECF No. 64 at 5 (citing *Ortiz v. Ben Strong Trucking, Inc.*, 624 F. Supp. 3d 567, 581 (D. Md. 2022)).  True enough.  But Starr is not asking the Court to establish JPF's liability and to grant Starr summary judgment.  Although the bill of lading may not conclusively establish JPF's liability at this procedural stage, its listing of JPF as a carrier of the shipment is undoubtedly a factor a jury might consider.  *See Tryg*, 767 F. App'x at 287 (noting that "[t]he Bill of Lading and the packing

list, both prepared by [a] non-party . . . , identified [the defendant] as 'carrier,'" which supported the trial court's conclusion, after a bench trial, that the defendant was a carrier).

Moreover, Starr points to 263 other bills of lading which list JPF as the carrier. Many of those are *identical* to the one at issue here, including the notation that Brown-Forman should contact JPF as the "carrier." *See generally* ECF No. 58-2. JPF points to no evidence that it ever objected to that listing in any previous dealing with BTB. *Tryg*, 767 F. App'x at 288 (noting that entity "did not object" to being listed as a carrier "until after the start of this litigation"). That extensive course of conduct could reasonably indicate that BTB considered JPF to be a carrier responsible in part for the delivery of the goods. *Essex*, 885 F.3d at 1302 (explaining that when no contract exists between the purchaser and defendant, a court should consider "how the party held itself out to the world, the nature of the party's communications and prior dealings with the shipper, and the parties' understanding as to who would assume responsibility for the delivery of the shipment in question").

The longstanding business relationship between JPF and BTB provides further factual support for deeming JPF a "carrier." For instance, both parties acknowledge that JPF contracted with BTB for many years yet never entered into a written agreement governing their relationship. *Louis M. Marson Jr., Inc. v. All. Shippers, Inc.*, 438 F. Supp. 3d 326, 332 (E.D. Pa. 2020) (finding genuine dispute where "[t]he record contains no writing that clearly states that Defendant acted as a broker"). JPF, in fact, estimates it "brokered, on average, between 150 and 250 loads per year on behalf of [BTB]," yet they never reduced the relationship to writing. ECF No. 46 ¶ 12. BTB's representative

explained that he always considered JPF to be a carrier because "[t]hey are responsible for delivering my load safely and completely," and because the relationship between the two was "governed by the bills of lading issued for various loads" which identified JPF as a carrier. ECF No. 58 ¶¶ 11, 15. The parties' divergent evidence about "the nature of [JPF's] communications and prior dealings with [BTB], and the parties' understanding as to who would assume responsibility for the delivery of the shipment in question," presents a genuine issue of material fact that the Court may not resolve at this stage. *Essex*, 885 F.3d at 1302; *see Tryg*, 767 F. App'x at 287 (holding that a business was a carrier because "despite [the business's] testimony that it had done business with [the shipper] for several years, [the business] could produce no document or communication in which it identified itself to [the shipper] as a broker."); *Custom Cartage, Inc. v. Motorola, Inc.*, No. 98 C 5182, 1999 WL 965686, at *8 (N.D. Ill. Oct. 15, 1999) ("[E]ven if Custom's understood role was to arrange the transportation for Motorola's goods, Custom is not necessarily a broker.").

Finally—and perhaps most relevant to the question of whether JPF assumed legal responsibility for this shipment—JPF did not act as a *connector* between BTB and JRO. To the contrary, BTB never knew about JRO's involvement until after the shipment was diverted and stolen. At that point, notably, BTB did not contact JRO, Easy Express, or Brown-Forman to ask where the shipment was but rather contacted JPF directly. Only then did JPF inform BTB about JRO's involvement. ECF No. 58 ¶ 24; ECF No. 46 ¶ 28. And JPF itself reached out directly to Brown-Forman to inquire about the shipment's location. ECF No. 46 ¶¶ 28–29. This reasonably suggests that JPF assumed responsibility for BTB's shipment. *See Essex*, 885 F.3d at 1302 (finding genuine dispute of material fact as to

16

whether the defendant was a carrier when third-party carrier's information was never provided to shipper and defendant "provided the name and cell phone number of one of its own employees as the emergency contact in case something went wrong"). And although it might be true that JPF never intended on transporting the liquor itself, that does not absolve JPF from liability as a carrier if it assumed responsibility for the shipment. *Richwell Grp.*, 425 F. Supp. 3d at 62 (genuine dispute of material fact as to whether defendant was a carrier when the shipper "had no knowledge of who would be transporting the load," and the defendant's representatives "were the sole point of contact" for the downstream entities). After all, the entire purpose of the Carmack Amendment was to codify "the commonsense proposition that when a party holds itself out as the party responsible for the care and delivery of another's property, it cannot outsource its contractual responsibility by outsourcing the care and delivery it agreed to provide." *Essex*, 885 F.3d at 1301. In short, the fact that JPF was identified as the point of contact by Brown-Forman, never notified BTB about JRO's involvement, and sought to figure out what happened with the shipment after it disappeared, reasonably suggests that JPF took responsibility for ensuring the transport of the shipment regardless of whether it was physically performing the shipment or arranging for another party to do so. That is consistent with the role of a carrier.

For many of these same reasons animating this Court's analysis of JPF's role, courts routinely note that whether an entity acts as a broker or carrier is inappropriate for summary judgment. *See Essex*, 885 F.3d at 1302. Ruling for JPF on its motion would require the Court to impermissibly weigh the conflicting evidence, as reasonable jurors could draw

different conclusions from the record as to whether JPF acted as a broker.  Accordingly, JPF's motion is denied as to Starr's Carmack Amendment claim.

### B.    Starr Forfeited its Negligence Claim

JPF also moves for summary judgment on Starr's alternative negligence claim, arguing that it is preempted or meritless.  ECF No. 44 at 25–36.  JPF extensively briefed its preemption argument and, in the alternative, asserted that it acted appropriately when it hired JRO to transport the shipment.  *Id.*  In response to JPF's motion, Starr focused its briefing exclusively on the Carmack Amendment claim.  *See generally* ECF No. 61.  Starr never mentioned its negligence claim, did not argue against preemption, and did not provide any factual support for its claim that JPF acted negligently.  *See generally id.*  In its reply, JPF noted that Starr failed to defend its negligence claim or provide "any evidence or testimony that would serve to support the claim," and asked the Court to consider it forfeited.  ECF No. 64 at 8–9.

At the hearing on the motions for summary judgment, Starr acknowledged that it failed to address the negligence claim in its briefing but informed the Court that it did not intend to concede the claim.  Instead, Starr informed the Court that it wanted to proceed with its negligence claim as an alternative to its Carmack Amendment claim.

That is not how summary judgment works.  "[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."  *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009).  That rule is particularly apt here.  The entire purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith*

18

*Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Starr asks the Court to forgo this step and to allow a claim to proceed to trial for which Starr has not met its burden to avoid summary judgment.  Not only would this allow a trial to proceed on a claim that potentially has no chance of success and allow Starr an end-run around summary judgment entirely, but it would also be highly prejudicial.  JPF has not had the opportunity to respond to Starr's arguments as to why its negligence claim should proceed.  Accordingly, the Court will grant JPF's motion for summary judgment on Starr's negligence claim.  *Satcher*, 558 F.3d at 735 (holding that failure to assert responsive argument "warrant[s] the entry of summary judgment").

## II.    Easy Express's Motion for Summary Judgment

Easy Express also moves for summary judgment on Starr's Carmack Amendment claim.  ECF No. 49.  Easy Express acknowledges that it is a carrier but asserts that Starr has not proven it is liable under the Carmack Amendment.  ECF No. 50 at 2.  In essence, Easy Express argues that because it delivered the liquor to the location provided by AB, it did nothing wrong.

Summary judgment for Carmack Amendment claims is only proper if the plaintiff "failed to establish a prima facie case" or if the carrier "made a sufficient showing to avoid liability."  *Cont'l Grain Co. v. Frank Seitzinger Storage, Inc.*, 837 F.2d 836, 840 (8th Cir. 1988).  A prima facie case requires a showing of (1) delivery in good condition; (2) arrival in damaged condition; and (3) the amount of damages.  *REI Transp.*, 519 F.3d at 699 (citation omitted).  If the plaintiff makes that prima facie case, the burden shifts to the carrier to prove it is not responsible because of (a) an act of God; (b) the public enemy;

(c) the act of the shipper himself; (d) public authority; (e) or the "inherent vice or nature of the goods." *Mo. Pac. R.R.*, 377 U.S. at 137 (citation omitted).

Easy Express essentially argues that its downstream contract with AB (which provided for delivery to Illinois) somehow overrides the bill of lading (which provided for delivery to Minnesota). Easy Express provides no citation that directly supports such a proposition, and it appears to conflict directly with the Carmack Amendment itself. Achieving uniformity in rules governing interstate shipments was the purpose of the Carmack Amendment, including consistent rules governing injury or loss to property shipped. *UPS Supply Chain Sols., Inc. v. Megatrux Transp., Inc.*, 750 F.3d 1282, 1285 (11th Cir. 2014). One of those fundamental rules is that the "bill of lading" governs the duration of a shipment and "becomes the governing contract between the parties." *Glass v. Crimmins Transfer Co.*, 299 F. Supp. 2d 878, 884 (C.D. Ill. 2004). Indeed, "the shipper's contract (actual or constructive), as embodied in or symbolized by the initial carrier's bill of lading to the shipper, is the sole agreement governing the duration of the carriage" and "*any overlapping bill(s) of lading issued by any subsequent carriers are void.*" *CNA Ins.*, 747 F.3d at 355 (emphasis added). Therefore, when multiple carriers handle one shipment, "the several carriers must be treated, not as independent contracting parties, but as one system; and the connecting lines become in effect mere agents, whose duty it is to forward the goods under the terms of the contract made by their principal, the initial carrier." *Mo., Kan., & Tex. Ry. Co. of Tex. v. Ward*, 244 U.S. 383, 387–88 (1917). In effect, "[t]he bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers." *S. Pac. Transp. Co.*

20

*v. Com. Metals Co.*, 456 U.S. 336, 342 (1982). To absolve Easy Express of liability because it delivered the shipment in accordance with the instructions of a third-party contract is therefore in direct conflict with the Carmack Amendment's requirement that the bill of lading governs the duties of the carrier. *Ga., Fla., & Ala. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 195 (1916)) (holding that "delivery" must mean delivery as required by the bill of lading).

Easy Express alternatively suggests that JPF is the carrier for the load, and Easy Express is a mere middleman. ECF No. 66 at 4–5. But that is irrelevant. The Carmack Amendment contemplates that multiple carriers may handle the same shipment and nevertheless places liability on each and all of those carriers. 49 U.S.C. § 14706(a)(1) ("The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States."); *see also CNA Ins.*, 747 F.3d at 353 (explaining that "Carmack makes the final, or 'delivering,' carrier liable to the shipper as well" as the original carrier, so "the aggrieved shipper need only sue the initial ('receiving') or final ('delivering') carrier and need not seek out the carrier actually at fault").

Because Easy Express identifies no legal basis upon which the Court may conclude that it is not liable to Starr, the Court denies Easy Express's motion for summary judgment.

## CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

21

1.     JPF's Motion for Summary Judgment (ECF No. 43) is **GRANTED IN PART AND DENIED IN PART** as follows:

    A.    JPF's motion for summary judgment on Starr's Carmack Amendment claim (Count I) is **DENIED**; and

    B.    JPF's motion for summary judgment on Starr's negligence claim (Count II) is **GRANTED**.

2.     Easy Express's Motion for Summary Judgment (ECF No. 49) is **DENIED**.

Dated: October 7, 2025              *s/Laura M. Provinzino*
                                       Laura M. Provinzino
                                       United States District Judge